823 So.2d 588 (2002)
Edward DILLON, Appellant,
v.
ROADWAY EXPRESS, INC. (Self-Insured), Appellee.
No. 2001-WC-01096-COA.
Court of Appeals of Mississippi.
July 30, 2002.
Jonathan B. Fairbank, Jackson, attorney for appellant.
Silas W. McCharen, Jackson, attorney for appellee.
*589 Before SOUTHWICK, P.J., BRIDGES, and BRANTLEY, JJ.
BRIDGES, J., for the court.
¶ 1. Edward Dillon filed his petition to controvert on August 17, 1998, alleging that he had suffered physical brain damage in the form of encephalopathy due to carbon monoxide inhalation on either September 26, 1997, or between April 10, 1997, and August 21, 1997. Roadway Express, Inc., Dillon's employer, denied the occurrence of the injury. Following the deposition of Dr. Frieburg, Dillon amended his petition on April 14, 1999, alleging mental injury. On September 18, 2000, the administrative law judge ruled that the weight of the evidence did not support Dillon's allegation of mental injury.
¶ 2. Dillon filed a timely petition for review on October 2, 2000. The Full Commission heard oral argument on April 2, 2001, and the next day issued an order affirming the administrative law judge. Dillon filed a timely notice of appeal. On June 13, 2001, the Lincoln County Circuit Court affirmed the Commission's order. Dillon perfected a timely appeal to this Court. We affirm.

ISSUE

WAS THE DECISION OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION SUPPORTED BY SUBSTANTIAL EVIDENCE?

FACTS
¶ 3. Edward Dillon worked for Roadway in various facilities and capacities from the late 1980s until September 26, 1997. At that time, Dillon was working at the Brookhaven terminal, where he had been since 1993. During his time at Roadway's Brookhaven terminal, Dillon was the only black employee at the Brookhaven terminal, and he felt he was being systematically disparately treated, although the EEOC found no illegal discrimination. Dillon had several grievances with his treatment at Roadway once he transferred to their Brookhaven facility, and several times used the union's collective bargaining agreement (CBA) to help resolve those grievances.
¶ 4. During the last year that he worked for Roadway, Dillon was written up a number of times by his supervisor; according to him, this was a result of racial animus. According to the supervisor and other employees, Dillon was increasingly violent and disruptive in the workplace. Dillon was assigned to drive Tractor 10717, which he complained was allowing excessive fumes into the cab and making him ill, and he filed a grievance with the union to request that he not be required to operate that tractor. Ultimately, Dillon continued to drive Tractor 10717 until September 26, 1997, when he terminated his deliveries to admit himself into the emergency room of Hardy Wilson Hospital in Hazlehurst.
¶ 5. The hospital gave Dillon some medication and discharged him. He finished his deliveries and returned to Brookhaven, complaining of nausea and light-headedness. Upon Dillon's return, his supervisor, Claudia Smith, informed him he was fired. He was escorted off of the premises, but later that dismissal was rescinded, and Dillon returned to work for Roadway. In the meantime, Dillon reported to the emergency room at the Southwest Regional Medical Center on September 27, complaining of headache and nausea.
¶ 6. Dillon returned to the emergency room on September 29 complaining not only of nausea and headaches, but also of short-term memory loss. Dillon was medicated, and the hospital referred him to Dr. Farina. Dillon reported to Dr. Farina on October 7, complaining of short term memory loss, irritability, jitteriness, and severe headaches. Dr. Farina administered oxygen *590 therapy to Dillon and requested follow-up treatment in two weeks. On October 13, Dr. Farina prescribed Zoloft to address Dillon's symptoms of anxiety, and on October 23, Dr. Farina suggested Dillon get a second opinion at either the Tulane Headache Center or the University Medical Center in Jackson.
¶ 7. Dillon reported to Dr. Frieburg at Tulane on November 12. Dr. Frieburg suspected encephalopathy as the cause of Dillon's symptoms, and ordered numerous tests, including MRI and psychological examinations. The MRI was normal, indicating that encephalopathy from carbon monoxide poisoning was an unlikely pathology. The psychological tests indicated that Dillon had borderline clinical depression, and Dr. Frieburg referred Dillon to an occupational medical specialist to conclusively rule out the possibility of encephalopathy. After numerous tests, Dr. Frieburg concluded that Dillon's problem was wholly psychological.
¶ 8. On October 15, 1999, Dillon saw Dr. Miller, a psychologist, who concluded that Dillon suffered from a chronically traumatic work environment and this had caused post-traumatic stress disorder to develop. Dr. Miller also diagnosed Dillon with depression. Roadway directed Dillon to Dr. Hiatt, a forensic psychiatrist, who concluded that Dillon suffered a conversion disorder that had coalesced around the events of September 26, 1997. Dr. Hiatt also concluded that Dillon suffered from paranoid personality traits, and that there was no evidence that his employment caused his mental harm.

ANALYSIS

WAS THE DECISION OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION SUPPORTED BY SUBSTANTIAL EVIDENCE?
¶ 9. The Commission's findings of fact are reviewed on a standard of substantial evidence, and will only be reversed if they are clearly erroneous and contrary to the overwhelming weight of the evidence. Financial Inst. Ins. Serv. v. Hoy, 770 So.2d 994, 997(¶ 6) (Miss.Ct.App.2000). The substantial evidence rule also prevents this Court from reaching a different decision than that of the Commission even if the evidence presented may have led us to conclude otherwise were we the finder of fact, provided that substantial evidence supports the Commission's findings. Id. When a claimant seeks compensation for purely mental injury, the claimant must prove this injury by clear and convincing evidence. Yet, even in cases coming from the Commission, we apply de novo review to matters of law. Id. Dillon does not contest the Commission's interpretation of the law, nor do we find any such errors; consequently, we shall review only the findings of fact.
¶ 10. Although Dillon began with a theory of physical trauma causing his mental harm, medical testimony subsequent to his filing caused him to abandon this theory and amend his filing to assert only mental harm. Dillon assigns as error the administrative law judge's finding that he did not prove his purely mental injury by clear and convincing evidence. Dillon contends that he proved his mental trauma beyond a reasonable doubt. Reasonable doubt is not the appropriate standard; clear and convincing evidence is the appropriate standard for proving compensable mental injury not caused by physical trauma. Fought v. Stuart C. Irby Co., 523 So.2d 314, 318 (Miss.1988). Dillon offers no law to support his argument on this point, instead resorting to selectively citing the medical testimony presented before the administrative law judge. Dillon offers no indication as to where the administrative law judge might have erred.
*591 ¶ 11. But beyond this, Dillon had also to prove that his mental injury was a work-related disability that was caused by more than the ordinary incidents of employment. Borden, Inc. v. Eskridge, 604 So.2d 1071, 1073-74 (Miss.1991). The evidence presented by Dillon conflicted directly with the testimony of Roadway's representatives, particularly regarding whether Dillon had been offered promotion at Roadway and whether the truck Dillon drove was defective and caused him to suffer carbon monoxide inhalation. In both cases, the administrative law judge assessed the credibility of the witnesses, and largely determined (without actually finding) that much of Dillon's testimony was incredible, particularly given the evidence of promotion, where records demonstrated that Dillon had been offered a promotion and had not taken it for the entire year that it was open to him. Dillon responded that he believed that taking the position would remove him from the protection of the collective bargaining agreement, and that Roadway was only offering the promotion so that they could fire him, once he was outside the aegis of the union.
¶ 12. Whether or not this was the case, Dillon's assertion that he had not been offered promotion at all was directly at odds with the evidence presented at trial. Dillon confirmed he had been offered promotion. Dillon recalled altercations that he initiated with fellow employees, but referred to them as misunderstandings, where Roadway employees recalled threats he had made. Finally, Dillon offers no argument beyond the administrative law judge misjudging the credibility of the witnesses for reversal of the Commission's decision.
¶ 13. Regarding the weight and conclusiveness of the expert testimony, although Dr. Miller indicated that Dillon's work environment was wholly responsible for his mental harm, Dr. Miller's diagnosis appears to be based solely on examining Dillon. Dr. Miller refers to Dillon suffering from carbon monoxide inhalation, which Dr. Frieburg's tests disprove. Consequently, it is likely that the chancellor inferred that Dr. Miller's testimony was not wholly accurate. Further, Dr. Hiatt, who examined Dillon at Roadway's behest, found indications of Dillon's psychological problems with chemical sensitivity occurring independently of his employment (in response to his wife's cooking certain dishes, for instance).
¶ 14. Dillon does not address these inconsistencies, and it is impossible to see how this Court could take steps to overrule the Commission based on tautological argument. Dillon's brief provides no evidence that, even if his employment was the root cause for his mental harm, the harm was caused by more than ordinary incidents of employment. The evidence before the administrative law judge on this point devolved into a he-said, she-said debate between Dillon and his supervisor, Smith, which this Court is plainly less able to judge than the administrative law judge who observed both witnesses. Smith's actions are consistent with her relatively benign explanations, but they may very well confirm Dillon's theory of overarching racial discrimination at Roadway's Brookhaven terminal. But this Court must defer to the determinations of the Commission where witness credibility is concerned, and this issue falls squarely within that area.
¶ 15. Consequently, this Court affirms the decision the Circuit Court in affirming of the Commission, as the evidence demonstrates no clear error.
¶ 16. THE JUDGMENT OF THE LINCOLN COUNTY CIRCUIT COURT AFFIRMING THE DECISION OF THE WORKERS' COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS *592 OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.